Good morning, everyone. The first case on the call this morning is case number 122802, Gregg v. Rauner, agenda number 15. Counsel, you may proceed. Good morning. My name is Tom Crosby. Together with Toby Smith-Peters and Tim Crosby, I represent the appellant, Eric Gregg. The issue before this court in this case is whether this court's decision in 1977, Lunding v. Walker, which interpreted the governor's removal power under Article V, Section 10 of the 1970 Constitution, is subordinate to the holding of Wilcox v. White, a case decided in 1877 interpreting the governor's removal power under the 1870 Illinois Constitution. It is the position of the appellant that Lunding, not Wilcox, is the law of the land. There is no longer a Wilcox rule to which Lunding is considered to be a narrow exception. The principles of stare decisis since 1977, as well as common logic, dictate that Lunding is controlling, as it interpreted the reach of the governor's removal power under the current Constitution, the 1970 Constitution, and substantively distinguished the removal power article and section that was in the 1870 Constitution in reaching its decision. I think your opposing counsel would argue that the drafters of the 1970 Constitution used language similar to the 1870 Constitution. So, Wilcox, what's your response to that? My response is that the Lunding court was cognizant of that, and one of the things that this court did in Lunding was to look at how the language of the 1970 Constitution was explained to the voters of the state. And in doing so, they looked at the official text and explanations that were put on the ballot when the people of the state decided whether or not to adopt that Constitution. And it was, the language of the explanations was that article 5, section 10, constituted a slight revision, and it means that the governor may remove for proper cause any officer he appoints. Justice Ryan and the majority found that it would be implausible to believe that the voters of this state could believe that for proper cause constituted the arbitrary whim of a governor simply plastering that arbitrary decision with magic words of incompetence, neglected duty, or malfeasance. So, even though the language is similar, the explanation given to the voters is certainly something that this court has in the past stated is irrelevant in determining the intent of the drafters of the 1970 Constitution. And that ship has sailed. This court has determined that the removal under the 1970 Constitution is different than that in the 1870 Constitution. As you know, this court in Lunding cited not only Wilcox, but the later Ramsey versus Van Meter case for the proposition that the drafters of the 1870 Constitution intended when they inserted the governor's removal power to have it mirror the removal power of the president. And it was for that reason that they looked to the developments of the federal doctrine of removal to determine whether or not the 1970 Constitution was going to be a fiat for the governor to arbitrarily dismiss anyone without question. And that trilogy of cases is instructive. The Meyer case, which involved the dismissal of the Postmaster General, which the United States Supreme Court said is certainly not reviewable because the Postmaster General executes executive duties and executive power and is in fact an arm and subordinate of the president. Now then the divergence from that absolute unreviewable dismissal removal power for the president came in the case of Humphrey's executor as well as the later case of Weiner. Humphrey's was the case that involved the Federal Trade Commission and Weiner, of course, was the war cost commission. And in both of those cases the United States Supreme Court found it relevant and controlling that they were designed to be, those commissions were designed to be independent and have their own duties, which were deliberative, quasi-judicial in nature. So the, as stated in Humphrey's and as repeated by this court in Lunding, there's no way that someone who can be discharged by the fiat of their superior can act independently. So, Mr. Crosby, does this really come down to how we interpret Lunding? You said, you know, they would like Wilcox to apply versus Lunding, but do we have to decide whether Lunding is outlining a narrow exception to the general rule of non-reviewability or whether it's signaled the court moving in a new direction towards allowing judicial review of all removal decisions when the agency is not? When the agency performs quasi-judicial functions? Is it not as clear as Wilcox versus Lunding, how you started out your argument, and is it more how we interpret Lunding as to what Lunding did? I think it's an interpretation of Lunding, and I think it's a reaffirmation of the principles in Lunding rather than the dichotomy between Wilcox and Lunding. As I said, Wilcox was decided under the 1870 Constitution, so clearly this court's decision in Lunding dealt with the 1970 Constitution, and what did it do? It established some basic functional criteria to determine whether or not the governor's removal power is subject to a cause review, and those functional criteria, it gleaned from that trilogy of federal cases. Now, the last of those federal cases was the Wiener case, which I believe was decided in the late 40s, and so in my brief, I tried to look at, has there been any further development in terms of the functional criteria in that trilogy of cases that might somehow impact this court's decision to reaffirm that the governor's removal power is subject to a cause review? And there has not been. I cited the Free Enterprise case, which Justice Roberts, in 2010, decided, and although the exact issue was not whether or not the president could remove a first-line officer, but rather a subordinate officer, both the majority and the dissent recapsulated what the current law says. And both said that that trilogy, particularly Humphreys and Wiener, were established, and that more than that, they pointed out that they don't constitute a violation of the separation of powers doctrine, because neither Humphreys nor Wiener, when they allowed a for-cause review, did so in an attempt by either Congress or the courts to usurp or take onto itself or themselves the president's removal power. The president, like the governor, is the only person who has the constitutional power to remove, and the general principle is that that authority is subject to a narrow limitation that was set forth in Lunding, and that involved looking at the functional criteria that this court adopted. Was the appointee an appointee to a body that was independent? We're now talking about the Illinois Prisoner Review Board. In the Lunding case, in the synopsis of what these three cases really said, it talked about Mayer, the Postmaster General case. And it said clearly, no matter what the duties that are performed, whether they're quasi-judicial or deliberative, the postmaster, who is exercising executive power and is subordinate to the president, cannot challenge his cause for removal. And why? Is that proper? Because the court in Lunding, citing Humphreys v. Executor, said that the Congress had in its power the ability to remove those quasi-judicial functions from a department of the executive and establish an independent agency to carry them out. And that's what's happened in Illinois in terms of the Illinois Prisoner Review Board. As this court knows, until the late 70s, there was a pardon and parole board, which carried out the functions of what currently the Illinois Prisoner Review Board does, and it was a part of the Department of Corrections. In the formation of the Illinois Prisoner Review Board, the legislature made clear that the Illinois Prisoner Review Board was to be independent from the Department of Corrections, therefore fulfilling the requirements to allow for a four-cause review. Why? Because, one, the Illinois Prisoner Review Board does not have any executive power. It doesn't exercise the powers that are granted to the government. It was created by the legislature to be independent. It requires its members to have qualifications before they can be appointed, as Mr. Gregg did. It has staggered terms different than that of the governor, six-year terms, to make sure that it has continuity beyond the term of one governor, clearly an example of the legislature trying to make an independent board. And finally, in terms of its 15-member composition, no more than eight can be of one party, and the chairman, the 15th, serves at the pleasure of the governor. So with this determination, counsel, we need to look beyond whether it performs a quasi-judicial function? Do we need to look beyond whether it performs a quasi-judicial function? You have to, I believe, the functional criteria set out by Lending, first you have to establish that it is an independent body, and then does it perform quasi-judicial functions? All of its functions do not have to be quasi-judicial. That's been established in the federal jurisprudence. But do you have to look beyond whether it performs quasi-judicial functions, only insofar as to determine whether the legislature intended it to be independent? I'm sorry. No, I was going to say, does it have any impact that it might be an executive branch entity? I don't think so, because when we look at the basics of the Lending decision, it was determined that the Board of Elections was part of the executive branch. And as has been pointed out by Governor Rauner, many of the branches of government, the departments, as well as the commissions, help serve the functions of the executive branch. Can you be more specific about what the duties are, the authority of the board is? Yes. The board members are controlled by their duties set forth in the statute. And the rules governing practice, as well as in class action settlements that the department is entered into, which are supposed to guarantee due process. So those functions involve, and the rules require, that the panels of three use their own deliberative skills, listen to the evidence, and make independent decisions on the matters that come before them. But what are the matters that come before them? You mentioned parole, and certainly before determinate sentencing that the parole board was very important in that, in terms of determining release. There are fewer and fewer cases like that. That's correct. So, and then on the other side, we know that they make recommendations regarding clemency. What falls in between? What else do they do? Well, in terms of the juvenile cases, which are more flexible in the approach, they set the terms and conditions of release as they do for adults. One of the primary functions that has been subject to federal litigation is when a parolee is said to have violated their parole and is arrested, the prison review board is supposed to provide initially prompt due process to determine whether or not that arrest facially constituted a violation of parole. So they have a duty to make sure that there's due process to those that are being brought back in the system under a claim that they violated parole, so that we have the freedom interest of that person. I don't think there's any real question here that it's a quasi-judicial body. Illinois law sets out six factors, and the Illinois Prison Review Board meets them all. In terms of the other specific duties, in regards to the Department of Corrections, if an inmate is sanctioned and good time is removed, the Illinois Prison Review Board looks at that and determines whether or not that is a proper sanction and has the ability to reinstate that good time. It tracks the juveniles and can change, as circumstances change, the conditions of parole or supervised release. These decisions have to be made in panels of three, which I think the whole thrust of the argument that it only applies to the Board of Elections because only the Board of Elections has equal bipartisanship, equal number of members. I think that that is a false argument because the Illinois Prison Review Board, which reviews thousands of cases a year, both juvenile cases and adult cases, could not function if it had to sit in panels that were of equal number because it, unlike this Court has decided, that the Board of Elections has sort of a unique position and that if it comes to a stalemate, so be it. But the legislature determined that the Illinois Prison Review Board was going to be a functionary of the penal system and was going to process these various issues that it had to deliberate on. It can't be gridlocked. It simply can't. And more than that, going back to the one-day decision of this Court in 1977, there was no proclamation that only boards with equal bipartisan make-up are those that are subject to cause review. Indeed, the federal cases that were relied on by this Court dealt with the Federal Trade Commission, which had five members. No more than three could be from one party. The War Claims Commission, three members, no more than two of one party. The Federal Courts interpreting the functional criteria set forth in Lunding has looked at the Illinois Industrial Commission, ten commissioners, no more than six from one party. This, by analogy, the appellate court has looked at the removal of the commissioners of fire and police, which has a commission comprised of three members, no more than two from one party. So this idea that Lunding is so limited to the facts of equal bipartisanship is simply not how Lunding has been interpreted for the last 41 years. Your time has expired. Thank you. Morning, Your Honors. May it please the Court, David Franklin, Solicitor General on behalf of Governor Bruce Rauner. The Illinois Constitution vests in the governor the ultimate responsibility for the fateful execution of the laws. To that end, Article V, Section 10 provides that the governor may remove, for incompetence, collective duty or malfeasance in office, any officer who may be appointed by the governor. Now, 140 years ago in the Wilcox case, construing a substantively identical provision of the 1870 Constitution, this court laid down the general rule. The governor is to determine for himself whether the cause of removal exists from the best lights he can get. And, crucially, his exercise of that authority cannot be reviewed by the courts. Now, this court has held on multiple occasions that where the 1970 framers carry over language, substantially similar language, from the 1870 Constitution, particularly where that language has been authoritatively construed by this court, the strong presumption is that the 1970 Constitution means to carry over that judicial doctrine. That is true, especially here, where the framers of the 1970 Constitution were well aware of that language. Delegate Young, for example, said, all we've done is cleaned up the language and shortened it a little bit, a quotation that appears in London. They were well aware of the rule of Wilcox and deliberately chose to maintain it, and with good reason, because that rule ensures political accountability. When the governor makes the requisite findings and removes an officer, just as when he vetoes a bill or permutes a sentence, he is answerable for that action in the political arena, not the judicial one. Now, there's been much talk today about the London case in 1976. In that case, this court recognized a narrow exception to the Wilcox rule that allowed judicial review of the governor's decision to remove a member of the state board of elections. Justice Thomas is quite correct that what we have to do here is interpret the breadth of the London decision, the breadth of the exception that it carved out to the background principle that had stood at that point for almost 100 years. As a back up to that, Mr. Franklin, this court has generally followed what the federal courts do in this area. And doesn't this seem like a situation where the federal courts would probably allow judicial review? The federal case law really operates along a different dimension. So what this court has said in both Wilcox and London is that federal law is instructive on the question of removal, but not controllable. We think that gets it exactly right. It's not controllable because there are clear differences between the federal law and Illinois law. Most notably, the federal constitution doesn't contain any explicit provision related to removal other than the impeachment clause. But we agree that it is instructive. And in fact, there have been three key developments in federal law since the London decision came down, all three of which support our position here. So if I may, I'll just take a moment to discuss those. First, in the US Supreme Court's most recent case involving removal, which was mentioned by my colleague, Free Enterprise Fund, it struck down a limit on presidential removal. And along the way, the court emphasized the compelling need for political accountability, the idea that the buck has to stop at the president's desk. Now, Mr. Gregg's counsel repeatedly quotes from the dissent in Free Enterprise Fund as if it were the majority opinion, though parenthetically indicating that it's the dissent. Unfortunately, he does so again on page 6 of his reply brief. But the fact remains that the majority in Free Enterprise Fund issued a striking reaffirmation of the chief executive's need for discretion in the exercise of the powers of removal. Second, the Supreme Court has, in fact, repudiated the reasoning of the Humphreys executor case, which was the source for much of the broad language in London. In the Morrison versus Olson case in 1988, the court acknowledged, yes, we used terms like quasi-judicial and quasi-legislative back in Humphreys' executor 50 years ago. But this is the court's language. Our present considered view is that the constitutional test for removal cannot be made to turn on those kinds of labels. It's the closest thing you'll find to a disavowal of a case's reasoning without an overt approval. So that's the second point I'd make about federal law. And third, in place of Humphreys' executor, the court has adopted a test that asks whether Congress has impeded the president's constitutional duty to take care that the laws be faithfully executed. And that's exactly what we submit the judicial second guessing of the governor's removal decisions would do. It would involve the judiciary's decisions that for 140 years have been committed to the governor's discretion, and for which the governor is quite properly answerable in the political arena in the court of public opinion and at the polls. Now, there's been much discussion, as I say, about Lunding. But we know that Lunding carved out a narrow exception to Wilcox, because the court says so in Lunding again and again. It says our decision is based on the unique character of the office held by the plaintiff. That's the member of the state board of elections. It says that its decision pertains to the particular factual setting of the board of elections. In the sentence that announces the holding, the court is careful to say, in this particular case. The court says on multiple occasions in Lunding, the question before it was, went to the breadth of the Wilcox rule. That's not something that you would say if you were overruling subsidential Wilcox. So it's a narrow exception. Specifically, the court in Lunding emphasized that the board of elections is created by the Constitution. In other words, the same drafters in 1970 who framed the removal provision that we're talking about today consciously chose to adhere to the Wilcox rule. Also mandated the creation of a state board of elections and chose, for good and sound reasons, to place that agency outside of the governor's unreviewable removal authority. The Lunding court also stressed the unique feature of the state board of elections that's been mentioned already this morning, which is that no political party can have a majority on the board. And perhaps most important, since my friend talks about functional rights, yes, the court in Lunding also stressed that the job of administering elections requires a unique degree of neutrality, absolute neutrality, and political independence to ensure the integrity of electoral administration. The Prisoner Review Board doesn't share any of the attributes that caused this court to carve out that narrow exception. The general rule of non-reviewability. The board was created by statute, not by the Constitution. It routinely features a partisan working majority. And, speaking of functional criteria, rather than exercising a function that requires absolute independence in the way the state board of elections does, the Prisoner Review Board is a part of what Lunding called the executive establishment. It assists the governor in carrying out laws, making policies, exercising his executive discretion. Justice Tice, I'd like to speak to your question on the precise duties and functions of the Prisoner Review Board. So, the board serves as a confidential advisor to the governor on matters of clemency. It's impossible, I think, to think of a subject that lies closer to the heart of the governor's executive discretion than pardons and commutations. The board makes parole decisions, decreasingly, of course, because they're only made for adult prisoners sentenced before 1978, although similar decisions are made with respect to aftercare reliefs for juveniles. And this board has held, of course, in the Hanrahan case, that parole denials are unreviewable because there are no enforceable standards to govern them. The administrative code describes parole as an exercise of grace and executive discretion. It makes clear that a parole hearing is not an adversarial proceeding. The board also sets conditions for mandatory supervised release. And the administrative code, again, this is the 20 Administrative Code, 1610, describes the standards, guidelines, really, for setting those conditions. There's broad discretion on the part of the board with respect to those. And that's because, again, setting conditions for MSR is a discretionary, forward-looking policy decision about how best to reintegrate an offender into the community. The code says that that reintegration takes place, quote, under any special conditions deemed appropriate by the board. Now, my opposing counsel tries to characterize the Prisoner Review Board as quasi-judicial, and we'd submit that that argument is fundamentally misguided for three reasons. First, this court has never described the Prisoner Review Board as a quasi-judicial body. In fact, this court is generally not in the business of describing entire agencies as quasi-judicial for all purposes. The notion of a quasi-judicial body really isn't a concept under Illinois law. Instead, what this court has done is it's used that label, quasi-judicial, to describe actions that agencies take, proceedings that they undertake. And it generally does so for the purposes of determining whether statements that are made during those proceedings are privileged against defamation actions. And so this court has repeatedly recognized, while many executive agencies sometimes act in an adjudicative capacity, that doesn't deprive them of their character as executive agencies. And that's the case here. Second point I'd make about the quasi-judicial label. While it's true that the Prisoner Review Board sometimes resolves disputed facts, most of the actions the board takes are not quasi-judicial in the sense that they involve the application of fixed legal rules to past acts or past facts. As I've already described, clemency and parole decisions are matters of executive discretion. The board has wide discretion in setting those forward-looking conditions of mandatory supervised release. The board also has wide discretion in terms of the factors and guidelines that it uses to determine whether it's going to approve a request from the Department of Corrections to revoke sentence practice. Really, the only proceedings in which the board acts in what we think of as a traditional quasi-judicial capacity, hearing exam or ALJ, are the hearings that determine whether there is initial probable cause to revoke parole or supervised release. And that's because the United States Supreme Court in the early 1970s, sort of at the height of the due process revolution, determined that there were a series of rather elaborate proceedings that had to take place for revocation of parole. That's Morrissey v. Brewer and Gagnon v. Scarbell. Third point, if I may, about quasi-judicial. Even if most of the actions the board took were quasi-judicial, and I hope I've convinced you that they're not, that still wouldn't be enough to convert the board into the kind of body that falls within the Lunding exception, that requires absolute political independence in order to carry out its functions with integrity. The Lunding exception, as I've said, was grounded in the distinctive features of the State Board of Elections. If the Lunding court had intended to broadly exempt quasi-judicial bodies, whatever that means, from the general constitutional rule of reviewability, it would have said so. So the quasi-judicial question, I think, really is a red herring here. Now, I'd like to spend just a few moments, if I may, talking about the merits here. If this court reaches the merits of the governor's approval decision, of course, we strenuously argue that it should not. But if you do, you should nonetheless affirm the appellate court, because it was not arbitrary. Let's talk about that for a minute, Mr. Franklin. I was going to mention that to Mr. Crosby. Obviously, if we agree with what the appellate court did, we don't get to the second issue as to whether it was valid cause or not, right, with respect to the removal. But because the appellate court ruled the way they did, they never got to the second issue. Is there merit if we disagree with what the appellate court did in the first instance and with your position that we merely remand it to the appellate court to address that question? I think you could do that. You could remand after articulating the standard on which that review ought to take place. There are really two issues to disentangle here. There's the standard of decision for the governor, and then there's the standard of review, if any, for courts reviewing the governor's decision. Of course, again, our position is that it's unreviewable. As to the standard of decision, again, this is an area that lies close to the heart of the governor's discretion. The governor has to be able to make that decision, as Wilcox colorfully put it, by the best lights he can get, about who he believes meets that standard of competence and adherence to duty. And for courts to second-guess that is a step in the wrong direction, as we see fit. But if it has to be done, it should be done on a very deferential standard of review, essentially that only those decisions to remove that are arbitrary, that are unrelated to the requirements of the service, that represent a clear abuse of that core executive discretion, should be overturned. And here, the governor concluded that Mr. Gregg's failure to file a statement of economic interests, which is a basic ethical requirement of all state officers, I suppose it's not that hard, his failure to report a gift, his failure to file an accurate Form 22C in conjunction with his bankruptcy filing, that those constituted in the governor's view, incompetence or neglect of his duties as an officer of the state. So the circuit court erred here, because it really did not give any discretion, or rather any deference to the governor's discretion in making that judgment, but reviewed the removal decision to no avail. So again, it's our view that you just can't read Lunding as having overturned Wilcox. To the contrary, Lunding recognized the framers of the 1970 Constitution by retaining language that was substantively identical to that that was interpreted in Wilcox, meant to maintain and deliberately chose to adhere to the Wilcox rule. But the exception that was recognized in Lunding was a function of the distinctive and unique necessity for the State Board of Elections, a constitutionally created office, to function with absolute neutrality. But I just would say in conclusion, even if you disagree with us about the proper interpretation of Lunding, and think that there's some kind of nebulous, all things considered, functional criteria test, it's still very clear, we would submit, that the Prisoner Review Board is on the Wilcox side rather than on the Lunding side of that line. The Prisoner Review Board's functions partake very strongly and centrally of the governor's own executive discretion, not just with respect to matters of clemency, but also with respect to matters of parole, conditions of mandatory supervised release, and other discretionary determinations that are placed at the heart of the executive establishment, rather than as some kind of independent agency, insulated from the governor's ordinary removal. So if the court has no further questions, we urge you to affirm the judgment of the appellate court. Thank you. I'll reply. I disagree that there is anything in Lunding that limits its scope to bodies that have a requirement of absolute political independence as evidenced by even split between its members. There is simply nothing in Lunding that suggests that. As a matter of fact, it found persuasive those line of federal cases where just the opposite occurred, where there was an intention by Congress to remove it from political influence by making a bipartisan make-up, yet at the same time allowed one of the parties to have a majority. Lunding differed from Wilkerson. Lunding didn't continue the rule of the 1870 Constitution. Lunding, this court in Lunding, looked at the way that the Article 5, Section 10 was explained to the voters and determined that for proper cause cannot mean an unquestionable arbitrary whim of the governor. And then it carved out from the governor's constitutional authority under the 1970 Constitution, functional criteria that allows for a for-cause review. Now, the proposition that the Illinois Prisoner Review Board is not a quasi-judicial body, I simply cannot stand. Look no farther than their mission statement. Their mission statement. The Illinois Prisoner Review Board's mission is to function under statutory authority as a quasi-judicial body with the primary focus on public safety. It has the six characteristics that the law of Illinois determines a quasi-judicial entity has. By statute, it is made independent of the Department of Corrections. It's independent. It has the power to conduct hearings, to subpoena, to allow for cross-examination, to compel the appearances of witnesses. Its decisions have an effect on a smaller group of people, the inmates. It is clearly a quasi-judicial body, and look at the numbers. Thousands and thousands of determinations concerning both revocation as well as establishing conditions of supervised release versus a few hundred recommendations one way or another on clemency. I disagree with counsel's suggestion that the federal law has moved away from Humphreys. It has not. Pre-Enterprise was not a case that the Supreme Court was looking at the first-line appointee to an independent body. Both in Morrison and in Pre-Enterprise, the Supreme Court said as to inferior secondary appointees to independent bodies, there can be no restriction from the president dismissing them. In Pre-Enterprise, a commission was set up under the SEC that was supposed to be independent, that before someone could be discharged, the SEC had to determine that the cause was valid. The Supreme Court said no. That prohibition on removing a secondary line officer, an inferior officer in an independent agency is an usurpation of the president's power. But as to those first-line appointees, as to the members, for example, of the Illinois Prisoner Review Board, the Pre-Enterprise, both the majority and the dissent, stated that Humphreys' executor and Wiener line were established law. An independent quasi-judicial deliberative body, the appointees to that body are subject to a four-clause review. And why not? Because they can't possibly do their job if they could be dismissed at the whim of a governor. Say a governor runs on the proposition that no one should get out of jail before their full sentence is served. And then if you do get out of jail on conditional release and you're re-arrested, no question you should go back to jail. Could a member of the Prisoner Review Board, with that Damocles sword hanging over his head, make a decision whether or not an inmate who's been released on conditional release should go back to jail? Could he make an independent deliberation that, no, he didn't violate the terms of his supervised release, knowing that to do so he could arbitrarily be removed? No, he could not. Let me ask you a question. Whether there's judicial review or not, the next question as to whether or not the gentleman's conduct here rises to a level of what it would be, cause, whether the governor's decision was arbitrary. Is that issue before us? I believe it is, because of the posture of this case, Your Honor. Judge Lambert had a trial, and the majority of the facts, all of the facts, that supported his declaratory judgment were stipulated to between Mr. Gregg and the state. There were witnesses whose credibility, the attorney in the bankruptcy proceeding who said that he made a Scrivner's error by putting Mr. Gregg's wife's income in his column on one schedule, although it appeared correctly in other parts that he amended it. And as well as the issue about the lift chair were found to be simply wrong. The governor says that there was a false statement of economic interest filed in 2013. What happened was Governor Quinn approached the mayor of Harrisburg, Mr. Gregg, about serving on the board in 2013. And in 2012, in April of 2012, sent him a packet with a statement of economic interest, which he filled out. He, at that time, was helping the city overcome the impact of a tornado, and then slightly thereafter, he had a serious health condition, which prevented him from going on the board. But the statement of economic interest that he filled out in April of 2012 was for the year 2011. The lift chair that he got post-surgery, he didn't get until 2012. It couldn't have been listed on the 2011 statement of economic interest. It wasn't a false filing. And I don't believe that the council is correct by saying that Judge Lambert ever said that Governor discharged Mr. Gregg for not filing a statement of economic interest for the year 2012. In 2013, in April of 13, when Governor Quinn sent his name to the Senate, the governor's office sent the prior statement of economic interest along with it. He was never asked to do a statement of economic interest for the year 2012. Indeed, he didn't. But the statute governing the statements of economic interest says that that simply is not a basis for discharge. Absence, a refusal, a notice of refusal to file. Not only that, in September of 2013, before the Senate confirmation hearing, this issue, whether or not he should have reported on the statement of economic interest, this gift of the chair, was brought to the attention of the Illinois Prisoner Review Board. Sent to the legal counsel, Ken Toopey, who did an investigation. After that investigation, there was no action taken by Quinn nor the Illinois Prisoner Review Board in relationship to demanding that he file a statement of economic interest for 2012 in subsequent years he filed. So they were simply mistaken. And not only that, the two reasons that they cite, a Scrivener's error on a bankruptcy form and the false statement of economic interest, have nothing to do with the discharge of his duties on the Illinois Prisoner Review Board, which is a prerequisite for the governor's actions for removal. Your time has expired. Thank you. Excuse me. Case number 122802, Gregg v. Rauner, will be taken under advisement as agenda number 15. Mr. Crosby, Mr. Franklin, we thank you for your arguments this morning, and you are excused.